RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0430P (6th Cir.)
File Name: 01a0430p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    *v.*

No. 99-2157

LEE WILLIAMS,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-81103—Robert H. Cleland, District Judge.

Argued: April 24, 2001

Decided and Filed: December 20, 2001

Before: RYAN and BATCHELDER, Circuit Judges;
MATIA, Chief District Judge.*

---

## COUNSEL

**ARGUED:** Gary J. Crews, Caro, Michigan, for Appellant. James C. Mitchell, ASSISTANT UNITED STATES ATTORNEY, Bay City, Michigan, for Appellee.

---

    *The Honorable Paul R. Matia, Chief United States District Judge for the Northern District of Ohio, sitting by designation.

1

**ON BRIEF:** Gary J. Crews, Caro, Michigan, for Appellant. James C. Mitchell, ASSISTANT UNITED STATES ATTORNEY, Bay City, Michigan, for Appellee.

————————

## OPINION

————————

RYAN, Circuit Judge. Lee Williams was indicted and convicted by a jury for one count of conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846. On appeal, Williams raises many issues, but we need not reach most of them because we conclude, as a matter of law, that venue was not proper in Michigan where the case was tried and that the district court erred in denying Williams's motion to change venue.

Therefore, we will reverse the judgment of conviction.

## I.

Lee Williams became involved in the drug conspiracy when Ronald Carboni, a government informant, contacted him to arrange the purchase of marijuana. Carboni became a confidential informant for the government, specifically the DEA, in order to reduce his sentence on drug charges unrelated to this case. He worked for, and supplied information to, Special Agent Cary Freeman in Michigan, by way of tape recorded conversations he had with Williams and codefendant Rodolfo Del Bosque regarding his desire to purchase marijuana. All of the conversations and events in furtherance of the conspiracy took place in and around Houston, Texas.

On January 9, 1998, Carboni called Williams to arrange a purchase of marijuana. Carboni told Williams that he had $250,000 to spend and it was agreed that Williams would put Carboni in touch with Williams's brother-in-law, Del Bosque, who would provide the drug, and that Williams would receive $50 per pound of marijuana as a fee for arranging the deal.

agreement did not provide the conspirators, Williams and Del Bosque, "substantial contacts" to Michigan. We do not believe that a government informant may arbitrarily determine venue merely by stating, falsely, where he intends to take the drugs for resale.

We conclude that venue was never proper in Michigan and the district court erred in refusing to transfer the case to Texas. We must, therefore, reverse the conviction.

We need not reach the jury instruction issue regarding venue or any of the other issues in the case because a new trial in Texas is required.

The judgment of conviction is **REVERSED** and the sentence is **VACATED**.

undercover agent, was not a conspirator. Moreover, he knew that the marijuana would never be sold in Michigan because he was facilitating the drug raid that would end the conspiracy in Texas.

We disagree with the district court's analysis regarding the substantial contacts test. Applying the test to the facts in this case, we conclude that venue is not proper in Michigan because: (1) the defendant's agreement was made in Texas; (2) all of the overt acts constituting the offense occurred in Texas; (3) the locus of the effect of the criminal conduct was exclusively in Texas, because, while Carboni mentioned Michigan as *his* final destination, the conspirators did not agree to that, and in truth, even Carboni did not intend to cause the drug to be sent to Michigan; and (4) Texas is the venue that is most suitable for fact finding, because the defendants live in Texas, their families, friends, and potential character witnesses live there and, as we have said, the offense and all of its elements, occurred there.

The government's argument that Michigan was a proper venue as well as Texas, is unpersuasive. Michigan was chosen as a venue *solely* for the convenience of the government; the case agent who was "sponsoring" Carboni was located in Michigan and the unrelated criminal offense for which Carboni was awaiting sentence was pending there. None of the overt acts in consummation of the conspiracy occurred in Michigan and the conspiracy had no effect in Michigan. Moreover, it was never intended to have any effect there. Carboni, acting for the government, knew when he was making his drug deals with Williams that the drugs would never reach Michigan and that the drugs would be seized and the defendant arrested in Texas. The government's argument notwithstanding, there is no evidence that the *conspirators* fixed the price of the marijuana based upon their determination that the drug could be re-sold for a higher price in Michigan. The conspiracy between Williams and Del Bosque was simply one to sell the marijuana in Texas to a buyer in Texas, who professed that it was *his* purpose (although it was not) to resell the drugs in Michigan. That

Soon thereafter, a conversation took place between Carboni and Del Bosque in which they discussed Carboni's receiving marijuana at $425-$450 per pound, for a total of $250,000. Del Bosque told Carboni that the marijuana would be supplied to him by three people.

On January 31, 1998, Carboni and Williams spoke again on the phone. Carboni told Williams that he had $242,000 in cash and a check for $2,000 in order to buy the marijuana. This would mean that, at $450 per pound, Carboni could purchase 542.22 pounds. Carboni told Williams that he was going to give all his money to Del Bosque and that Del Bosque could give Williams his portion of the cash. When Carboni said he was still $2,000 short, Williams suggested that Carboni do some work on Williams's roof to make up the difference.

Carboni and Del Bosque met several times between 6:00 p.m. and 8:00 p.m. on January 31, while they waited for the marijuana to arrive. At one point, Carboni saw 20 pounds of marijuana in a refrigerator in Del Bosque's garage. Around 7:30 p.m. Carboni saw three men unloading large bundles from the trunk of a car in Del Bosque's garage. Shortly after 8:00 p.m. a search warrant was executed at Del Bosque's residence. Several large bundles were found at the side of the garage, where it appeared someone had hurriedly thrown them down, and still more marijuana was found in Del Bosque's garage.

Williams was indicted in the Eastern District of Michigan for conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846. He pled not guilty to the charge and filed a pretrial motion to change venue, arguing that Texas was the proper venue for the prosecution. The motion was denied. During the trial, Williams filed an objection to the proposed jury instructions regarding venue, but his objection was overruled. At the close of the trial, Williams moved for judgment of acquittal pursuant to Fed. R. Crim. P. 29, but the motion was denied.

## II.

At trial, most of the evidence introduced against Williams came from tape recorded conversations between Carboni, the undercover informant, and Williams, and between Carboni and Del Bosque. During a taped conversation between Carboni and Williams, Carboni asked, "[I]s there any good smoke around?" to which Williams responded, "Yeah . . . [p]lenty of it." The following colloquy ensued:

[Carboni]: . . . Set me up. . . .

[Williams]: Yep. . . . I can't really talk, man, you know. . . . Call me in the morning, man, about 11:30.

During a conversation the following day, Carboni and Williams further discussed the terms of the deal:

[Carboni]: I want to spend about 250,000.

[Williams]: Okay. Well –

[Carboni]: That way I'll have enough to where I can go up there to Michigan and stay there a while. Hey, Lee, up there they pay more per pound.

[Williams]: Yeah. Yeah, I know.

[Carboni]: And I mean it's much nicer, but don't get no trash. Get good ones. It don't have to be excellent. Medium. . . . As long as it's not all pressed in like a rock, I want nice fluffy buds --

[Williams]: Um-hmm.

[Carboni]: -- or if it's pressed, as long as it smokes good, I'll settle for that. And figure put your $50 apiece on each one.

[Williams]: Well, let's talk about that on another line, man.

Michigan, the government argues, and therefore, venue was proper in Michigan, although not only in Michigan.

The government claims that other facts justify venue in Michigan: Williams's codefendant was in custody in Michigan pending trial; Williams's attorney resides in Michigan; documents and physical evidence had already been shipped to Michigan; and witnesses were present in Michigan. While the government admits that venue was proper in Texas, it argues that it is also proper in Michigan, and therefore the case should not have been transferred to Texas.

### B.

The defendant argues that an accurate reading of the facts of the case shows that no overt acts occurred in Michigan and that the declared intention of one of the parties to the transaction—the government's undercover agent—to take the drugs to Michigan, is not enough to justify venue being laid in Michigan.

## VI.

After carefully reviewing the opinions of the magistrate judge and the district court, and examining the record, we find no evidence that the offense or any overt act in furtherance of the Williams/Del Bosque conspiracy occurred in Michigan, or that any effect of the conspiracy occurred there.

Since a government agent cannot be a conspirator, *United States v. Pennell*, 737 F.2d 521, 536 (6th Cir. 1984), the only conspirators were Williams and Del Bosque. The evidence, taken in the light most favorable to the prosecution, shows that these men conspired to sell marijuana; the evidence does not show that their agreement was to do so for the purpose of causing the drugs to be resold or distributed in Michigan. The evidence shows, at most, that Williams and Del Bosque agreed to a drug transaction that began, was consummated, and ended in Texas. It is true that they heard Carboni mention that *he* was going to sell the marijuana in Michigan because he could get more money for it, but Carboni, the

This court stated in *United States v. Scaife*, 749 F.2d 338 (6th Cir. 1984), that "venue is proper in conspiracy prosecutions in any district where the conspiracy was formed or in any district where an overt act in furtherance of the conspiracy was performed." *Id.* at 346 (citing *United States v. Winship*, 724 F.2d 1116, 1125 (5th Cir. 1984); *Downing v. United States*, 348 F.2d 594, 598 (5th Cir. 1965)). "Conspiracy and drug importation are continuous crimes; that is, they are not completed until the drugs reach their final destination, and venue is proper in any district along the way." *United States v. Turner*, 936 F.2d 221, 226 (6th Cir. 1991) (internal quotation marks and citations omitted). Venue may also be had in more than one location. *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985).

In *United States v. Williams*, 788 F.2d 1213 (6th Cir. 1986), we adopted from *Reed*, 773 F.2d 477, the substantial contacts test to determine venue. Both courts concluded:

"a review of relevant authorities demonstrates that there is no single defined policy or mechanical test to determine constitutional venue. Rather, the test is best described as a substantial contacts rule that takes into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact finding. . . ."

*Williams*, 788 F.2d at 1215 (quoting *Reed*, 773 F.2d at 481).

## V.

### A.

The government argues that under the substantial contacts test, venue is proper in a district which is the *locus* of the effect of the criminal conduct. *Reed*, 773 F.2d at 483-84. According to Carboni, the drugs were headed for distribution in Michigan because the drugs could be sold for a higher price in Michigan. The effect of the crime would be felt in

At trial, Carboni testified that Williams referred him to his brother-in-law, Rodolfo Del Bosque, and made the arrangements for Carboni to contact Del Bosque.

According to the taped conversations, Carboni informed Del Bosque that it was his intention to take the marijuana he purchased in Texas and to sell it in Michigan. In furtherance of this plan, Carboni and Del Bosque met in a parking lot of a supermarket and discussed the deal. Del Bosque agreed to supply 520 pounds of marijuana for about $425 to $450 per pound. Carboni stated, "I want all the money at once to get all good ones. . . . And then I'll take off. I'm headed straight to Michigan." Later in the conversation:

[Del Bosque]:  Let me ask you something. Can I count on you? If I tell this guy, "Hey, man, bring me a thousand pounds," will you turn them for me?

[Carboni]:    Oh, yeah . . . [expletive], yeah.

[Del Bosque]:  Okay.

[Carboni]:    I'll even put all that 250 down just to show good faith.

[Del Bosque]:  Look. Let me -- I was talking to Lee, you know, and, mind you, I don't want to put Lee to the side or nothing.

[Carboni]:    Oh, I know.

[Del Bosque]:  He's my brother-in-law. Okay? And the thing is that what I want to cut down is the activity, you know, me call him, him call you, you call him, he calls me. . . . That's how come I told him, "Let me talk to Ronnie. Let me tell him what we need to do in order to cut down on all this s---," you know . . . .

Williams was convicted on count one of conspiracy to possess with intent to distribute marijuana. He was sentenced

to 71 months' imprisonment and five years' supervised release.

### III.

Williams raises two claims of error regarding venue. He alleges that: (1) the district court's decision to deny his motion to change venue was error; and (2) the district court gave an improper instruction to the jury regarding venue.

Prior to trial, Williams filed a motion he termed "Motion for Change of Venue." In his brief before us, he makes two specific arguments regarding venue. First, that venue was improper in the Eastern District of Michigan, because, according to Fed. R. Crim. P. 18, prosecution is proper in "a district in which the offense was committed." Williams claims that since neither the offense nor any of the overt acts with which he is charged occurred in Michigan, but rather in Texas, venue was not proper in Michigan. Williams reminds us that he preserved the issue for appeal because he filed an objection to the proposed jury instructions regarding venue, but it was overruled.

Second, Williams argues that venue should have been transferred to Texas under Fed. R. Crim. P. 21(b) for the convenience of the parties.

For the reasons we shall discuss, we agree that venue was not proper in Michigan and that the case must therefore be transferred to Texas.

### IV.

Article III, Section 2, Clause 3 of the United States Constitution states the basic venue requirements for criminal prosecutions under federal law.

> The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the

> Trial shall be at such Place or Places as the Congress may by Law have directed.

U.S. Const. art. III, § 2, cl. 3. "The guarantee is for a trial in the state and district where the offense was committed." *United States v. O'Donnell*, 510 F.2d 1190, 1192 (6th Cir. 1975). Further, this guarantee is applied through Fed. R. Crim. P. 18, which states:

> Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed. The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice.

Fed. R. Crim. P. 18.

"Questions of venue in criminal cases, therefore, are not merely matters of formal legal procedure. They raise deep issues of public policy in the light of which legislation must be construed." *United States v. Johnson*, 323 U.S. 273, 276 (1944). However, this court has stated, "[w]e conclude that venue is likewise a privilege granted to the accused rather than a jurisdictional prerequisite, a conclusion which is consistent with the overwhelming case law holding that improper venue may be waived." *Williams v. United States*, 582 F.2d 1039, 1041 (6th Cir. 1978).

Federal Rule of Criminal Procedure 21(b) states that a case may be transferred to another venue:

> **(b) Transfer in Other Cases.** For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another district.

Fed. R. Crim. P. 21(b). When, as in this case, a conspiracy is charged, the question of locating the proper venue can be difficult.